**Paula LAIRD, on her own behalf and on behalf of all others similarly situated, Plaintiffs,**

v.

**Ted STILWILL, in his official capacity as Acting Director of the Iowa Department of Education, Defendant,**

**and**

**Shirley Chater, Commissioner of the Social Security Administration, Defendant/Intervenor.**

No. C 95–3015–MWB.

United States District Court,
N.D. Iowa,
Central Division.

June 12, 1997.

Tom A. Krause, Martin Ozga, Des Moines, IA, and Legal Services Corp. of Iowa, Des Moines, IA, for plaintiffs.

Christine J. Scase, Des Moines, IA, and Iowa Attorney General's Office, for Ted Stilwill.

Daphene R. McFerren, Washington, DC, and U.S. Dept. of Justice, for John J. Callahan.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1171

II. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1172

III. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1174
 A. Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1174
 B. Disputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1178

IV. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1179
 A. Requirements of a § 1983 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1179
 B. Whether DDS Properly Evaluates The Plaintiffs' Subjective Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1180
 C. Whether DDS Makes Express Credibility Determinations . . . . . . . . . . . . . 1188
 D. Whether DDS Uses The Services Of Qualified Vocational Specialists When Evaluating Social Security Claims . . . . . . . . . . . . . . . . . . . . . . . . . 1189
 E. Whether DDS Fails to Properly Assess Residual Functional Capacities With Sufficient Detail as Required by Federal Regulations and Eighth Circuit Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1193
 F. Whether the Disability Benefits Granting Process Denies the Plaintiffs Equal Protection of the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 1195

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1199

BENNETT, District Judge.

In this class action lawsuit, the plaintiffs challenge the standards, policies and procedures the defendant Stilwill and the administrative body he oversees, the Iowa Disability Determination Services Bureau (DDS), and the defendant John J. Callahan and the administrative body he oversees, the Social Security Administration, use to determine whether Iowans who apply for Social Security Disability Insurance and Supplemental Security Income benefits are disabled within the meaning of the Social Security Act and other the relevant authority which governs the disability benefits granting process in Iowa. In cases where the stakes are high and the attorneys act as particularly zealous advocates for their clients, the court is often called upon to make a number of major decisions prior to the actual trial on the merits. This case is no exception. The court already issued a substantive decision denying the defendants' motion to dismiss and allowing the plaintiffs to proceed on a § 1983 cause of action. *Laird v. Ramirez*, 884 F.Supp. 1265 (N.D.Ia.1995).[1] Now, the de-

---

1. On May 30, 1997, the state defendants filed a second motion to dismiss for lack of jurisdiction, citing the recent Supreme Court case of *Blessing v. Freestone*, —— U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). One week later, on June 6, 1997, the federal defendants filed a similar motion also based on *Blessing*. Rather than delay

fendants have filed a motion for summary judgment and the plaintiffs have filed a motion for partial summary judgment. In the conflicting motions the court considers today, the defendants argue neither of the plaintiffs' two claims allege any genuine issues of material fact, and the plaintiffs argue the defendants' responses to two subparts of their first claim raise no genuine issues of material fact.

## I. INTRODUCTION AND BACKGROUND

Plaintiff Paula Laird filed her complaint on February 15, 1995, alleging a violation of 42 U.S.C. § 1983 following the denial of her application for disability benefits based on major depression and low back spasms. The defendant is Ted Stilwill, the Director of the Iowa Department of Education.[2] The Iowa Department of Education, through its Disability Determination Services Bureau (DDS), is authorized to make initial determinations for Iowa claimants as to whether or not such claimants are disabled within the meaning of the Social Security Act. Based on allegations of immediate and irreparable harm from the financial distress resulting from improper determinations of no disability, the plaintiff also filed a motion for a preliminary injunction on February 15, 1995. However, on March 30, 1995, the defendant moved to dismiss this matter for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1). After consultation with the parties, the court determined it should consider the motion to dismiss first. On April 24, 1995, the court issued a ruling allowing the plaintiff to proceed on her § 1983 claim and denying the defendant's motion to dismiss. The next day, the court granted the plaintiff's motion to conditionally certify a class action. The conditional class was identified as,

> residents of the State of Iowa, who in the two years preceding the filing of this action have been or may in the future be denied Social Security Disability Insurance and Supplemental Security Income bene-

fits as a result, in whole or in part, of one or more the following policies, practices, and procedures of the State defendant. Amended Complaint, ¶ 10. On May 22, 1995, the court issued an order granting the defendant's unresisted motion to allow the Commissioner of Social Security John J. Callahan to intervene as a party-defendant in this case. The same day the court entered an order finding the plaintiffs' motion for a preliminary injunction moot. On April 12, 1996, the court granted the plaintiffs' motion to file an amended and supplemented· complaint. As a result of that order, named plaintiff William Meeks was added as a party to this suit. Then, on January 17, 1997, the defendant Callahan filed the instant motion for summary judgment. Defendant Stilwill joined Callahan's motion on January 23, 1997. On February 5, 1997, plaintiffs Laird and Meeks filed the instant partial motion for summary judgment.

In the plaintiffs' amended and substituted complaint, they raise two claims for relief. The first claim has two four subparts, to wit:

a. DDS did not properly evaluate the Claimant's subjective allegations under 20 C.F.R. § 404.1529 and § 416.929, and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (*supplemented*, 751 F.2d 943 (8th Cir.1984), *vacated*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand*, 804 F.2d 456 (8th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)) and progeny.

b. DDS did not make an express credibility determination and set forth the inconsistencies in the record that lead DDS to reject the claimant's complaints of pain, expressly discussing the five *Polaski* factors. *See, e.g., Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991); *Prince v. Bowen*, 894 F.2d 283, 286 (8th Cir.1990); *Rainey v. Department of Health and Human Services*, 48 F.3d 292, 293 (8th Cir.1995).

c. DDS did not utilize the services of a qualified vocational specialist in evaluating

---

this litigation by waiting for the plaintiffs' reply briefs and the defendants' responses, the court chooses to rule on the pending motions for summary judgment now and to address the motions to dismiss when the briefing of that issue is complete.

2. The original named defendant was Al Ramirez, the erstwhile director of the Iowa Department of Education. Stilwill has since replaced Ramirez as director. Pursuant to Fed.R.Civ.P. 25(d)(1), Stilwill was automatically substituted for Ramirez as a defendant in this case.

the claimant's claim, contrary to 20 C.F.R. § 404.1569a(d) and § 416.969a(d). Social Security Ruling 83–14, and *McCoy v. Schweiker,* 683 F.2d 1138 (8th Cir.1982), and progeny.

d. DDS' assessments of residual functional capacity are not documented to support the adjudicative conclusion of just what the individual can still do in a work setting, are not fully responsive to the claimant's statements, including those about symptoms (especially pain) which concern the nature and extent of the impairments, and do not contain detailed assessments of the individual's capacity to perform and sustain activities that are critical to work performance, contrary to 20 C.F.R. §§ 404.1545–46, 20 C.F.R. §§ 416.945–46. Social Security Ruling 85–16 and Social Security Ruling 85–23.

Amended Complaint ¶ 34a–d. The plaintiffs' second claim is that, "By applying one of two separate standards of review in disability determinations, Defendant Stilwill has violated plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Amended Complaint ¶ 37. As mentioned, the defendants seek summary judgment with respect to both of the plaintiffs' claims. The plaintiffs seek summary judgment with respect to subparts (a) and (b) of their first claim, which concern DDS's evaluations of their subjective allegations, and DDS's alleged failure to make express credibility determinations based on the record and an examination of the *Polaski* factors.

With this background in mind, the court turns to the applicable standard for evaluating motions for summary judgment in district courts governed by United States Supreme Court and Eighth Circuit Court of Appeals precedent.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit's standard for reviewing motions for summary judgment is clearly settled and often recounted. "Summary judgment is appropriate when there is no dispute between the parties as to any genuine issues of material fact and when the

moving party is entitled to a judgment as a matter of law." *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995) (quoting *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992)). Or, as the pertinent rule of civil procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Fed.R.Civ.P.* 56(c). When courts make this determination, "Any inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

"A court is not 'to weigh the evidence and determine the truth of the matter, [instead it should] determine whether there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 272 (8th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202). "Such an issue exists and summary judgment must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik,* 47 F.3d at 957 (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11). To determine if a jury could return a verdict in favor of the nonmoving party, a court must determine which are the material facts and whether, together, they create genuine issues of material fact. "In order to determine which facts are material, courts should look to the substantive law in a dispute and identify the facts which are critical to the outcome." *Commercial Union,* 967 F.2d at 272 (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). "In determining whether a material factual dispute exists, the Court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct.

1689, 1694, 123 L.Ed.2d 317 (1993) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment. *Commercial Union,* 967 F.2d at 272 (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). In performing the genuineness inquiry, trial courts should believe the evidence of the party opposing summary judgment and all justifiable inferences should be drawn in that party's favor. *Id.* (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513).

Procedurally, "[T]he ultimate burden of proof is on the movant ... to establish that there are no material facts in dispute and that, as a matter of law, the movant is entitled to judgment." *Oldham v. West,* 47 F.3d 985, 988 (8th Cir.1995) (citing *Fed. R.Civ.P.* 56(c)); *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56; *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[3] For that reason, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (citing *Fed.R.Civ.P.* 56(c)). Even so, "Rule 56 does not require the moving party to negate the elements of the nonmoving party's case; to the contrary, 'regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.'" *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

However, "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." *Beyerbach,* 49 F.3d at 1325 (citing *Commercial Union,* 967 F.2d at 271) (in turn citing *Fed. R.Civ.P.* 56(e)).[4] "The mere existence of some alleged factual dispute will not defeat a properly supported summary judgment motion." *Churchill Bus. Credit, Inc. v. Pacific Mutual Door Co.,* 49 F.3d 1334, 1336 (8th Cir.1995) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). Along the same lines, the Eighth Circuit had long held that "parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995) (citing *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir. 1983)). Likewise, "the non-moving party must substantiate his allegations with sufficient probative evidence that would permit a finding in [the party's] favor based on more than mere speculation, conjecture, or fantasy." *Wilson v. International Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995) (citing *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir.1994) (internal quotations omitted)).

Ultimately, courts must "recognize that summary judgment is a drastic remedy and must be exercised with extreme care to pre-

---

**3.** In this case, the movants with respect to the motion for summary judgment are the defendants Stilwill and Callahan, and the movants with respect to the motion for partial summary judgment are the plaintiffs Laird and Meeks and all others similarly situated.

**4.** The pertinent portion of Fed.R.Civ.P. 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific issues facts showing that there is a genuine issue for trial.

In this case, the non-moving parties with respect to the motion for summary judgment are the plaintiffs Laird and Meeks and all others similarly situated. The non-moving parties with respect to the motion for partial summary judgment are the defendants Stilwill and Callahan.

vent taking genuine issues of fact away from juries," *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990) (citing *Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988)), and balance this understanding against the principle that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting *Fed.R.Civ.P.* 1).

### III. FINDINGS OF FACT

#### A. Undisputed Facts

It is undisputed by the parties that one of the purposes of the Iowa Disability Determinations Services Bureau (DDS) is to determine whether Iowans who apply for Title II disability benefits and Title XVI Supplemental Security Income benefits are eligible to receive those benefits.[5] To that end, the Iowa DDS has a regulatory agreement with the federal Social Security Administration (SSA). The agreement requires DDS to hire its own employees, but DDS must use the SSA's guidelines to carry out its work and must abide by and agree not to challenge the SSA's interpretations of the law as it pertains to granting Social Security benefits. DDS also receives all of its funds from the SSA.

DDS does not make an independent determination of whether its policies are consistent with Eighth Circuit case law, nor does its former administrator Ray Van Cura[6] believe his bureau is entitled to do so; he believes decisions of this type are the sole province of the SSA. Sometimes the SSA issues Acquiescence Rulings which direct all the state DDS bureaus located in an area

governed by the same circuit court of appeals to acquiesce to a ruling made by that Circuit. Unless there is an Acquiescence Ruling, the state DDS bureaus adjudicate their cases according to nationwide SSA policy. The SSA has issued no Acquiescence Rulings which pertain to four subparts of the plaintiffs' first claim. In sum, the Social Security disability program is a federally-funded program that is, state operated according to federal guidelines. To insure that its employees and contractees are aware of the SSA's regulations, DDS distributes copies of the Program Operations Manual System (POMS), which is a handbook of Social Security rules and regulations. The Iowa DDS also provides its employees and contractees with information digests, informational letters and policy statements which update them on the SSA's interpretation of Social Security law.

The disability granting process follows this procedure: A claimant completes an application for disability benefits at an SSA field office. The claim is forwarded to one of fifty-four state DDS offices where medical evidence is developed and a final decision is made regarding the existence of a medically determinable impairment which meets the definition of disability. On average it takes 120 days for a claimant to receive an initial decision. Nationally, 39% of these claims are allowed. In Iowa, the decision is made by a disability examiner and a medical or a psychological consultant. A small number of these decisions are randomly selected for a quality assurance review at another level of the DDS or by a regional SSA Disability Quality Branch. If the claim is denied at the initial level, the claimant has sixty days to request reconsideration. The parties dispute how long it takes for a reconsideration decision to be issued. Nationally, 48% of claimants request reconsideration and DDS ap-

---

**5.** "Title II of the [Social Security] Act provides benefits for insured individuals suffering from a disability rendering them unable to engage in substantial gainful activity. 42 U.S.C. § 423(a) and (d)(1)(A) (1982). Title XVI, on the other hand, which was enacted in 1972, affords benefits to persons who are aged, blind, or disabled and whose financial resources fall below minimum levels, regardless of whether they have insured status under Title II. 42 U.S.C. § 1382(a) (1982)." *Galbreath v. Bowen,* 799 F.2d 370, 371

(8th Cir.1986). With regard to Title II benefits, "To qualify for insured status, an individual is required to have 20 quarters of coverage in the 40–quarter period ending with the first quarter of disability. 42 U.S.C. §§ 416(I)(3)(B) and 423(c)(1)(B)." *McClees v. Shalala,* 2 F.3d 301, 302 n. 3 (8th Cir.1993).

**6.** Van Cura was employed by DDS for 41 years. He retired on December 27, 1996.

proves 14% of the reconsidered claims upon review.[7]

Within sixty days of an unfavorable decision at the reconsideration level, a claimant can request a hearing before an ALJ. Nationally, about 75% of all claimants who are denied benefits at the reconsideration level request an administrative hearing. About 75% of claimants retain counsel for the administrative hearing. About 67% of all claimants are successful at the administrative hearing level.

Within sixty days of an unfavorable decision at the administrative hearing level a claimant may request that the Appeals Council review the case. The Appeals Council reviews about 18% of all ALJ dispositions, including those it reviews on its own motion. The Appeals Council denies about 70% of the claims it reviews. If the Appeals Council denies a claimant benefits, the claimant has sixty days during which he or she may appeal the decision to federal district court.

DDS made initial determinations for 15,122 persons applying for Title II and Title XIV benefits during fiscal year 1994 (July 1, 1994, to June 30, 1995), and allowed 8,627 of those claims.[8] Also during that year, DDS made 6,814 reconsideration determinations, allowing 1,159 of those claims. In an average year, DDS makes about 7,000 or 8,000 reconsideration disability determinations. About 15% of those determinations reverse the initial denial. DDS also performs about 1,200 to 1,500 continuing disability reviews.

It is also undisputed by the parties that the Social Security Administration reviews the Iowa DDS (as well as other states' DDS bureaus) accuracy rates over the course of fiscal years. The regional Kansas City Disability Quality Branch (DQB) reviews Midwestern states. According to the Kansas City DQB, the Iowa DDS's accuracy rates upon initial consideration were 94.0%, 94.5%, and 93.0% for fiscal years 1994-96, respec-

tively. The corresponding national rates were 94.4%, 94.2%, and 94.5%. The Iowa DDS's accuracy rates upon reconsideration were 92.7%, 92.8%, and 92.9% for fiscal years 1994-96, respectively. The corresponding national rates were 92.7%, 91.7 %, and 92.7%. For fiscal years 1994-96, the Kansas City DQB reviewed 158 initial level medical-vocational denials in which the primary medical impairment was physical and determined one of the 158 claims should have been allowed rather than denied. For fiscal years 1994-96, the Kansas City DQB reviewed 414 initial level medical-vocational denials in which the primary impairment was physical and determined sixteen of the 414 claims should have been allowed rather than denied.

Regardless of what level of determination a claimant's benefits application is being evaluated, there is a sequential evaluation process that all adjudicators must use to analyze disability claims:[9]

(1) Is the claimant currently engaged in substantial gainful activity? If "Yes," the claim is denied. If "No," go to Step 2.

(2) Is the claimant's medical impairment or combination of impairments severe enough that it significantly limits physical or mental ability to do basic work activities? If "Yes," go to Step 3. If "No," the claim is denied.

(3) Does the claimant have an impairment or combination of impairments which meets or equals the duration requirement and is contained in the listing of impairments? If "Yes," the claim is approved. If "No," go to Step 4.

(4) Does the claimant have an impairment or combination of impairments which prevents past relevant work? If "Yes," go to Step 5. If "No," the claim is denied.

---

7. *But see* the second disputed fact in the "Disputed Facts" section.

8. Persons who filed two applications were counted twice.

9. Though the parties have not plead the entire contents of this and the next paragraph in their statement of uncontested facts, the court takes judicial notice of these facts to provide the background necessary to adequately explain the issues at hand to the uninitiated reader. Both parties refer to the five-step process in their memorandums in support of their motions.

(5) Can the claimant, given his residual functional capacity and his age, education and past work experience perform any other work which exists in substantial numbers in the national economy? If "Yes," claim is denied. If "No," claim is approved.

See 20 C.F.R. § 404.1520(a)–(f)(1) (1996); *Williams v. Sullivan,* 960 F.2d 86, 88 (8th Cir.1992).

The claimant bears the burden of making a prima facie case of disability, which includes proof of no substantial gainful activity under Step 1 and proof of severity under Step 2. *See* 20 C.F.R. § 404.1512(c) (1996); *Williams,* 960 F.2d at 88. At Step 3, it is the job of a medical or a psychological consultant employed by the Social Security Administration to determine whether a claimant's impairments meet or equal a listing. 20 C.F.R. § 404.1526(b) (1996), *see also Cruze,* 85 F.3d at 1322. At Step 4, the claimant has the burden of proving that he cannot return to his past relevant work. *See Baumgarten v. Chater,* 75 F.3d 366, 368 (8th Cir.1996) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)). If the claimant meets his burden of proof at Step 4, the burden shifts to the Commissioner to establish the claimant's ability to perform other work in Step 5. *Id.*

In order to conduct the five-step process above, DDS hires medical and psychological consultants, disability examiners, and vocational specialists. The consultants are under contract to DDS; they are not employees. Medical and psychological consultants are either doctors or psychologists. About half are clinical psychologists. The psychological and medical consultants prepare either mental residual functional capacity assessments (MRFCA), physical residual capacity assessments (PRFCA), or both types of assessments for every claimant who applies for Social Security benefits. By combining the MRFCAs and PRFCAs, the consultants develop a residual functional capacity (RFC) which describe just what work-related skills and abilities a claimant has remaining after taking into account all of his or her physical and psychological limitations.

Dr. Dee E. Wright has a Ph.D. in psychology from the University of Utah and is currently under contract with DDS as a psychological consultant. He performs initial reviews. After reviewing medical evidence about a claimant, Dr. Wright fills out a psychiatric review technique form (PRTF). In about one out of eight cases, medical consultants will return the file and request additional information from the claimant or treating physician. If Dr. Wright ultimately determines a claimant does not meet or equal the Listings of Impairments, he then is required to conduct a further review which involves a form called a mental residual functional capacity assessment (MRFCA). If Dr. Wright finds a claimant needs to nap for two hours during the day, he would find that person had a moderate restriction in their ability to maintain concentration, persistence or pace. If Dr. Wright finds the claimant's need for a nap to be credible, he would not typically record that finding in his narrative or in the MRFCA, unless he believed that, standing alone, that restriction would be enough to support a finding of a severe restriction of function. Instead, Dr. Wright would incorporate the need for a two-hour nap into other functional considerations such as attention and concentration. Dr. Wright uses the claimant's complaints as well as other evidence to develop the MRFCA.

Dr. Lawrence F. Staples has an M.D. from the University of Iowa and is currently under contract with DDS as a medical consultant. Dr. Staples is unfamiliar with the term "express credibility determination." Dr. Staples does not make specific findings about whether a claimant's allegations are correct or incorrect when he prepares his RFC assessments. When preparing his RFCs, Dr. Staples always gives controlling weight to objective medical evidence derived from whatever medical tests and examinations the claimant has undergone, as opposed to relying on the claimants' objective complaints, including complaints of pain. But, Dr. Staples does consider a claimant's symptoms such as pain, along with diagnosis, treatment regimen, and the need for hospitalizations or medical appointments when assessing claimants' residual functional capacities (RFCs). The need for absences, unscheduled work breaks, or

the need to lie down during the work day, or to elevate a leg above heart level, are reflected only if they impact the specific work-related activities in section I of the Physical Residual Functional Capacity Assessment (PRFCA) form. These needs may, however, be reflected in the MRFCA. These needs may also be reflected, in the ratings given in assessing the individuals' ability to perform work-type duties and complete a normal work day and work week without interruption.

The consultants' consideration of the claimant's subjective complaints is ordinarily contained in the physical and mental residual functional capacity forms and the psychiatric review technique form. To facilitate the consultants' perusals of the files, DDS staffers prepare the files by highlighting the objective evidence with paper clips. This objective evidence may include, for example, a claimant's descriptions of his or her daily activities or a listing of his or her seizures.

Terri R. Bernstine works for DDS and supervises nine DDS disability examiners. Bernstine testified disability examiners are concerned with the fourth and fifth steps of the disability granting process. In the fourth step it must be determined whether the claimant's RFC would allow them to perform their past relevant work. In the fifth step it must be determined whether the claimant's RFC would allow them to perform any other competitive work in the national economy. In other words, a disability examiner's role is to take the RFCs developed by the medical and psychological consultants and use them to complete the DDS's analysis of the five steps in the disability granting process.

It is also undisputed by the parties that newly-hired disability examiners receive training regarding the disability determination process. After their initial training, disability examiners are assigned a reduced case load and work in conjunction with a trainer (either an experienced examiner or supervisor) in deciding claims for disability and are provided more autonomy after demonstrating a certain amount of proficiency in their duties. Disability examiners receive advanced training on medical-vocational is-

sues after eighteen months of processing initial applications for disability benefits. Occasionally, the DDS offers agency-wide formal training relating to the issues in this lawsuit. It is disputed as to when the last training session took place.

Neither the SSA's rules, polices nor practices require that the medical and psychological consultants or vocational examiners who make medical and vocational determinations at DDS level be vocational specialists with qualifications the same as or similar to those of the vocational experts who advise administrative law judges at higher levels of SSA's disability claim review.

Jack Edward Reynolds is a certified vocational rehabilitation counselor who is designated as an expert witness for purposes of testifying at administrative hearings when an ALJ determines whether a claimant is disabled. Reynolds testifies at approximately 300 hearings a year. He testified he can give better testimony if the ALJ poses a more specific question. He also testified there are certain recurring limitations that preclude competitive employment such as elevating a leg above the heart, having to lie down in general for any length of time and missing several days of work each month due to illness or fatigue.

Class representative Paula Laird filed concurrent applications for Title II disability benefits and Title XVI Supplemental Security Income benefits on September 6, 1994. Laird was thirty-eight years old at the time. In her applications, Laird alleged impairments including depression, back problems and past problems with drug and alcohol abuse. Laird had been seen by physicians numerous times for depression prior to filing for disability. The psychological consultant who examined Laird's records found she did not meet any of the disability listings. The disability examiner who reviewed Laird's application determined she could perform her past relevant work as a nurse's aide. On reconsideration, however, DDS granted Laird's application for disability benefits. Disability Determination Services based its decision to grant benefits on the finding that Laird had severe mental depression and was markedly limited in her mental residual func-

tional capacity in areas deemed critical to meeting and sustaining the demands of competitive unskilled work.

William Meeks filed for Title XVI Social Security Disability benefits in early 1995 and was denied upon initial review on October 19, 1995. Meeks alleged impairments including hearing loss, cardiac impairments and a stroke. There was ample evidence in Meek's medical records which documented each of these claims. Upon initial consideration, DDS found Meeks could hear adequately in his left ear and would be able to work an eight-hour day with continued treatment from his heart surgery. Disability Determination Services also found Meeks's conditions were not expected to last more than twelve months and, therefore, Meeks could return to his past work as a salesperson. Upon reconsideration, however, DDS allowed Meeks's claim after reviewing additional evidence and concluding he had classical signs of non-union of the sternum.

### B. Disputed Facts

The record reflects the following facts are in dispute. The question to be addressed below, in the court's legal analysis, is whether these disputes of fact are material under the governing law, such that they preclude summary judgment on any of the plaintiff class's claims. See, e.g., Fed.R.Civ.P. 56(c); Celotex Corp., 477 U.S. at 322–23, 106 S.Ct. at 2552–53; Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; Beyerbach, 49 F.3d at 1326.

First, the federal defendants argue DDS offered its entire adjudicative staff training which discussed the Social Security Administration's latest policy changes in late September and early October of 1996. The plaintiffs claim DDS has not offered agency-wide training to its adjudicative staff since November 1, 1994. The state defendants agree DDS has not offered agency-wide training since November 1, 1994, but it argues: (1) training on pain standards were presented to DDS professional staff and medical consultants on April 27, 1995; (2) three new disability examiners completed training between June 2, 1995, and September 1, 1995, which included two weeks of RFC/MRFCA and vocational evaluation training; (3) DDS staff received training on June 17, 1996, on evalu-

ating symptoms of pain and fatigue and documentation of pain and symptoms; and (4) all DDS supervisors, disability examiners and medical consultants were required to attend a three-day training session in the fall of 1996 discussing the new Social Security Rulings the Administration issued in July of 1996.

Second, the defendants dispute the fact that nationally 14% of reconsidered claims are allowed and returned. The defendants argue that, without pointing out that sometimes the state DDS or the local Disability Quality Branch perform quality assurance reviews of claims before a final reconsideration decision is made, the plaintiffs have misstated the record.

Third, the defendants believe it takes approximately 103 days before a claimant receives a reconsideration decision, and 258 days if benefits are awarded. The plaintiffs believe it takes approximately 68 days to receive a reconsideration decision, longer if benefits are awarded.

Fourth, it is disputed by the parties whether the medical and psychological consultants make findings of fact about the nature and severity of claimants' impairments. The plaintiffs argue that neither SSA nor DDS uses the terms "express credibility finding" or "express credibility determination," although Social Security rules require a claimant's subjective complaints be considered and addressed. The federal defendants argue, after the promulgation of Social Security Ruling 96–7p on July 2, 1996, DDS adjudicative staff must make "credibility" observations, even if they are not called "express credibility determinations." The state defendants argue that while it does not use the term "express credibility determination," the regulations that it must follow, such as 20 C.F.R. §§ 404.1529 and 416.929 (1996) and POMS §§ 24515.061–24515.064 discuss the credibility of a claimant and, in effect, require the DDS adjudicative staff to make express credibility determinations.

Fifth, the plaintiffs argue that, on average, a medical consultant spends a minimum of fifteen minutes on a case analysis and adjudication. The consultant may spend an addi-

tional five to thirty minutes analyzing the file and answering questions for the disability examiner. The defendants argue that, for medical consultants to analyze a file and respond to DE questions, five minutes is the "low time," fifteen minutes is the "medium time," and thirty minutes is the "high time." The defendants argue that, for medical consultants to complete case analysis on adjudication (including the completion of the RFC assessment), fifteen minutes is the "low time," thirty minutes is the "medium time," and sixty minutes is the "high time." The defendants argue that, for medical consultants to review and sign the decisional document, one minute is the "low time," two minutes is the "medium time," and five minutes is the "high time."

## IV. LEGAL ANALYSIS

The court chooses to begin its analysis of these motions for summary judgment by discussing subparts (a) and (b) of the plaintiffs' first claim on which both sides have competing motions for summary judgment. In these subparts of their first claim the plaintiffs argue: (1) DDS does not properly evaluate their subjective allegations under 20 C.F.R. § 404.1529 and § 416.929 (1996); and *Polaski;* and (2) DDS did not make an express credibility determination and set forth the inconsistencies in the record that lead DDS to reject the claimant's complaints of pain, expressly discussing the five *Polaski* factors. After discussing these issues, the court will discuss subparts (c) and (d) of the plaintiffs' first claim as well as the plaintiffs' second claim. On these last three issues, only the defendants have filed a motion for summary judgment. First, however, the court will discuss the general requirements of a § 1983 claim.

### A. Requirements of a § 1983 Claim

Rather than discuss, at length, the requirements for bringing a claim pursuant to 42 U.S.C. § 1983, the court notes it analyzed many aspects of § 1983 claims in its memorandum and order holding the plaintiffs properly plead their claims as causes of action pursuant to 42 U.S.C. § 1983.[10] *Laird v. Ramirez,* 884 F.Supp. 1265 (N.D.Ia.1995). But, before the court begins its analysis of the merits of claims at issue in this case, it is necessary to make one additional observation about § 1983 claims. In *Garza v. City of Omaha,* the Eighth Circuit Court of Appeals explained:

A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor; however local governments like every other § 1983 'person,' may be sued for constitutional deprivations visited pursuant to governmental 'custom.' It is not necessary that such a custom receive formal approval through official decision-making channels. *Monell v. Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). A discriminatory custom may be established by evidence that the practices of state officials are so permanent and well settled as to carry the force of law.

814 F.2d 553, 555 (8th Cir.1987). *See also Andrews v. Fowler,* 98 F.3d 1069, 1074 (8th Cir.1996) (holding governmental liability attaches only when constitutional deprivation is custom or policy); *Ricketts v. City of Columbia, Missouri,* 36 F.3d 775, 779 (8th Cir.1994) (same). *Garza* is particularly relevant to the analysis of the instant case not because it discusses municipal liability, but because it explains that any governmental liability must be based on well-settled custom which carries the force of law.

In this case, the plaintiffs have documented their claim by citing sections of official sources such as the United States Code, the Code of Federal Regulations, as well as Social Security Rulings (SSRs). They have also cited depositions from employees and contractees of the DDS which indicate these

---

**10.** It is appropriate, however, to repeat the language of the statute:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (1996).

people work hard to follow the mandates of the Code, the C.F.R. and SSRs. It is clear that, if the court finds the violations the plaintiffs allege do exist, they exist as policies or customs and are not isolated events. The fighting issue, therefore, is whether the policies the plaintiffs have identified constitute violations of federal law. The court will now evaluate the plaintiffs' claims.

### B. Whether DDS Properly Evaluates The Plaintiffs' Subjective Allegations

In the first subpart of their first claim, the plaintiffs argue DDS does not properly evaluate their subjective allegations under 20 C.F.R. §§ 404.1529 and 416.929 (1996), and *Polaski.* More specifically, the plaintiffs argue the Commissioner and, hence, DDS which follows the rules the Commissioner promulgates, places too great of reliance on objective medical evidence in determining whether a claimant is disabled and lends too little credence to the claimant's subjective claims about his or her symptoms, including complaints of pain. They argue that, once a claimant has established by medically acceptable objective evidence an underlying impairment that could reasonably be expected to cause pain, a claimant's subjective complaints about the intensity or degree of his or her pain alone can be enough to establish disability. *See Brand v. Secretary,* 623 F.2d 523, 525 (8th Cir.1980), *Clark v. Chater,* 75 F.3d 414, 417 (8th Cir.1996). There need not be, they argue, objective medical evidence of the extent of the pain to confirm the claimant's subjective complaints. To review this claim, the court must examine the two Code of Federal Regulations sections the plaintiffs cite as well as *Polaski.* The first Code section provides:

We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining or consulting physician or psychologist, and observations by our employees and other persons.... Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3) (1996). The relevant portion of the second C.F.R. section the plaintiffs cite is 20 C.F.R. § 416.929(c)(3) (1996) and it contains precisely the same language as 20 C.F.R. § 404.1529(c)(3) (1996). The above quoted material appears to mean that, *ceteris paribus,* both subjective and objective medical evidence should be considered when determining disability and neither type of evidence should necessarily trump the other.

The plaintiffs also cite the ubiquitous *Polaski* case. In *Polaski,* the Eighth Circuit held:

The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency and intensity of the pain;

3. precipitating and aggravating factors;

4. dosages, effectiveness and side effects of medication;

5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski*, 739 F.2d at 1322. The language set out above also indicates that both subjective and objective medical evidence should be considered when determining disability and neither type of evidence is necessarily superior to the other.

Upon juxtaposing the language in the C.F.R. sections cited above with the Eighth Circuit language in *Polaski*, it is apparent the *Polaski* language is simply a condensed paraphrasing of the federal regulations. For all intents and purposes, therefore, the Eighth Circuit's subsequent interpretations of *Polaski* will also control this court's interpretation of 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (1996).

On the other hand, the plaintiffs take issue with other pertinent language in the Code of Federal Regulations. For example, 20 C.F.R. § 404.1529(a) (1996) provides:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to *which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence* .... We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. *However,*

*statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.*

20 C.F.R. § 404.1529(a) (1996) (emphasis added). The same language is found in 20 C.F.R. § 416.929(a) (1996). In contrast to *Polaski* and similar C.F.R. sections, these C.F.R. sections indicate that a claimant cannot prove the existence of a disability without first providing objective medical evidence to support claims that his or her particular medical problem is capable of producing symptoms severe enough to constitute disability. These dueling C.F.R. sections appear to conflict with each other, creating a situation where the courts are called on to determine which regulations are the correct interpretation of the Social Security Act.[11]

■■■ The Eighth Circuit has resolved this conflict in favor of *Polaski* and those C.F.R. sections which *Polaski* paraphrases. The Eighth Circuit has held, in order to conduct the proper *Polaski* analysis, "Merely quoting *Polaski* is not good enough, especially when an ALJ rejects a claimant's subjective complaints of pain." *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995). Instead, "*Polaski* requires that an ALJ give full consideration to all of the evidence presented relating to subjective complaints." *Ramey v. Shalala,* 26 F.3d 58, 59 (8th Cir.1994). In making that consideration, "The absence of an objective medical basis to support the claimant's

---

11. This is not a *Chevron* situation where the courts are required to defer to an agency's permissible construction of a statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Instead, this situation more closely resembles *Wilkes v. Gomez,* where the Eighth Circuit held, "[I]t is true that an agency's interpretation of a regulation that conflicts with

a prior regulation is entitled to considerably less deference." 32 F.3d 1324, 1329 n. 6 (8th Cir. 1994) (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987)). In this case where the agency seems to have adopted contemporaneous conflicting statutes, the principle is the same: the courts must make sense of the conflict.

subjective allegations of pain is simply one factor to be considered along with all of the evidence presented relating to subjective complaints." *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir.1995). Therefore, "an adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not support them." *Dodson v. Chater,* 101 F.3d 533, 534 (8th Cir.1996). The logical basis for this rule,

> stems from the recognition that the physiological, functional, and psychological consequences of illness and injury vary with each individual. A given injury may affect one individual in an inconsequential way, whereas the same disorder may severely disable another person who has a greater sensitivity to pain or whose physical condition is deteriorated.

*Cockerham v. Sullivan,* 895 F.2d 492, 496 (8th Cir.1990). It is only "after full consideration of all of the evidence relating to subjective complaints" that an "adjudicator may discount those complaints if there are inconsistencies in the evidence as a whole." *Dodson,* 101 F.3d at 534. As the above cited cases demonstrate, and as the plaintiffs argue, it is not necessary for a claimant who files for benefits in the Eighth Circuit to produce objective medical evidence that the symptoms he or she suffers as the result of an underlying impairment are severe enough to cause disability. A claimant's subjective complaints alone are sufficient to prove disability.

■ Given that *Polaski* holds a claimant need not provide objective medical evidence of disablement to prove he or she is disabled, the court must now decide whether the current practices of the SSA and, hence, DDS violate that holding. The plaintiffs argue such is the case, and in support of their argument they cite SSR 96–7p [12] which provides:

[O]bjective medical evidence is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of an individual's symptoms and the effect those symptoms may have on the individual's ability to function. The examples in the regulations (reduced joint motion, muscle spasm, sensory deficit, and motor disruption) illustrate findings that may result from, or be associated with, the symptom of pain. When present, these findings tend to lend credibility to an individual's allegations about pain and other symptoms and their functional effects.

Social Security Ruling 96–7p, Titles II and XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements, 1996 WL 374186 at *6 (July 2, 1996). This is the latest in a series of Social Security rulings devoted to the evaluation of subjective complaints. Preceding rulings were denoted 82–5, 88–13, and 95–5p. The plaintiffs argue SSR 96–7p encourages adjudicators to place greater weight on objective medical evidence (as opposed to subjective medical evidence) than *Polaski* deems appropriate. The court is not entirely convinced by this argument. While it is true the preceding passage allows that objective medical evidence can serve as a "useful indicator" in making a reasonable determination as to whether a person is disabled, it says nothing about the conclusions an adjudicator should draw when there is not objective medical evidence to support a claimant's subjective complaints. In the final sentence of the paragraph the plaintiffs find objectionable, the ruling provides objective medical evidence lends credibility to a plaintiff's complaints "when present." The plaintiffs argue adjudicators will infer the negative inverse, i.e., the lack of objective medical evidence detracts credibility from a claimant's subjective allegations. It is equally plausible, however, to read this passage as expressing no opinion as to how an adjudica-

---

12. "Social Security rulings are intended to bind only the Social Security Administration. 20 C.F.R. § 422.406(b)(1). They have neither the force nor effect of law or Congressionally promulgated regulations." *Newton v. Chater,* 92 F.3d 688, 693 (8th Cir.1996) (citing *Heckler v. Edwards,* 465 U.S. 870, 874 n. 3, 104 S.Ct. 1532, 1535 n. 3, 79 L.Ed.2d 878 (1984)). As mentioned in the undisputed findings of fact, the DDS has agreed to use the SSA's guidelines to carry out its work and has agreed not to challenge the SSA's interpretations of the law *as it pertains* to granting Social Security benefits. For this reason Social Security rulings are binding on the DDS as well.

tor should interpret a lack of objective medical evidence.

Analysis of the preceding quotation from Ruling 96–7p is also inconclusive as to whether it places an undue emphasis on objective medical evidence in violation of the dictates of *Polaski.* Even if the analysis tended to support the plaintiffs' or defendants' position, it would still be necessary for the court to review additional relevant portions of ruling 96–7p to determine if the above quotation is taken out of context. The court finds this portion of 96–7p particularly relevant:

> When there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms, the adjudicator must always attempt to obtain any available objective medical evidence concerning the intensity and persistence of the pain or other symptoms, and, when such evidence is obtained, must consider it in evaluating the individual's statements. *However, allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. A report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility. However, the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.*

Social Security Ruling 96–7p, 1996 WL 374186 at *6 (July 2, 1996) (emphasis added).

The emphasized language in this quotation tracks the Eighth Circuit's recent *Polaski* holdings almost word for word. It emphasizes that an adjudicator cannot dismiss a claimant's subjective complaints solely because there is no objective medical evidence to support them, *Dodson,* 101 F.3d at 534;

that the lack of objective medical evidence to support a claimant's subjective complaints is one of many factors to consider, *Harris,* 45 F.3d at 1193; and that the adjudicator must consider the subjective complaints in the context of all the evidence, *Dodson,* 101 F.3d at 534, *Ramey,* 26 F.3d at 59. This part of Ruling 96–7p, at least, seems to place exactly the same emphasis on subjective complaints as the Eighth Circuit has interpreted *Polaski* to place of subjective complaints.

The plaintiffs acknowledge there are parts of Ruling 96–7p which they do not find objectionable. They argue, however, the Ruling is ultimately flawed because its stated purpose is only to "clarify" past Rulings such as 95–5p and 88–13, and not to overturn them. Because the previous rulings were even greater departures from the true meaning of *Polaski* and perpetrated a false interpretation of Social Security law which required objective medical evidence to corroborate a claimant's symptoms before he or she could prove disability, they argue, Ruling 96–7p is ultimately flawed because it codifies the improper conclusions of the previous rulings. In support of this argument, the plaintiffs cite a portion of SSR 88–13:

> If the listing is not met or equaled, a residual functional capacity (RFC) assessment is necessary to determine the effects of the impairment, including any additional limitations imposed by pain, on the claimant's capacity to perform former work or other work. Medical history and *objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusion about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity.* Whenever available, this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability. There are situations in which an individual's alleged or reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical

evidence alone. In such cases, reasonable conclusions as to any limitations on the individual's ability to do basic work activities can be derived from the consideration of other information in conjunction with medical evidence. *This is consistent with court decisions which require that statements of the claimant or his/her physician as to the intensity and persistence of pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings are to be included in the evidence to be considered in making a disability determination.*

SSR 88-13, 1988 WL 236011, *2 (July 20, 1988) (emphasis in plaintiffs' brief), which they argue is in flagrant violation of *Polaski.* The court agrees that the emphasized portions of SSR 88-13 above tend to give the false impression that it is necessary for a claimant to produce objective medical evidence to substantiate their subjective complaints about the intensity of their symptoms before they can be found disabled.

In *Hyatt v. Sullivan,* 899 F.2d 329 (4th Cir.1990), the Fourth Circuit addressed an issue almost identical to the issue with which this court is currently wrestling: whether the Commissioner's Social Security rulings place undue evidence on objective medical evidence at the expense of claimants' subjective complaints. The *Hyatt* court rejected SSR 88-13 for its undue emphasis on objective medical evidence and described one part of the SSA's standard stating, "Such a requirement of objective evidence as to the pain's intensity is improper."[13] *Id.* at 334. To rectify the situation the court added, "Should the Secretary wish to amend the ruling to *make it clear that it is not a reiteration of previous policy* and that it has a more current effective date which does not adopt rejected policy, then the regulation may remain in effect."

*Hyatt,* 899 F.2d at 336.[14] That is to say, the Fourth Circuit agreed with the contention the plaintiffs make in this case, that whatever changes the Commissioner makes in his new Rulings mean little if he continues to clarify rather than break with the policy established in his previous Rulings.

The plaintiffs also refer to the disputed findings of fact in which they claim DDS has not offered agency-wide training since November 1, 1994. They argue that, even if the most recent Social Security Ruling to address subjective complaints of pain, SSR 96-7p generally adheres to *Polaski,* it is unrealistic to expect that DDS's employees and contractees will be familiar with the changes in policy, despite the written notices in changes of policy which those persons may have received. For similar reasons, the plaintiffs argue that a recent memorandum from the associate commissioner for disability to the regional commissioner, Chicago, Re: Questions of the Issue of Pain and Residual Function Capacity (RFC) Limitations, dated January 10,.1995, is of limited use in correcting the systemic problem. Two other, but similar memoranda, sent to the regional commissioners in San Francisco and Denver were issued prior to the most recent agency-wide training in Iowa, but they were not addressed to the regional commissioners whose region includes Iowa. Whether or not there has been agency-wide training is a disputed fact. The defendants claim they offered their entire adjudicative staff training which discussed the new SSRs such as 96-7p in late September and early October of 1996. This fact is disputed, but if ultimately the court accepts the defendants' training claims (as seems likely) this factor would not favor the plaintiffs.

---

**13.** The Fourth Circuit was reacting to the language included in both SSRs 82–5 and 88–13 which stated:

Objective clinical findings which can be used to draw reasonable conclusions about the validity of the intensity and persistence of the symptom and about its effect on the individual's work capacity must be present. For example, in cases of back pain associated with disc disease, typical associated findings are muscle spasm, sensory loss, motor loss, and atrophy. There must be an objective basis to support the

overall evaluation of impairment severity. It is not sufficient to merely establish a diagnosis or a source for the symptoms.
*Hyatt,* 899 F.2d at 333–34.

**14.** *Hyatt* led to SSR 90–1p, the express purpose of which was "to supersede SSR 88–13 in the Fourth Circuit and to transmit to adjudicators the Fourth Circuit's standard on the evaluation of pain." SSR 90–1p, 1990 WL 300812 at *1 (Aug. 6, 1990).

In their final argument with respect to the Commissioner's practices, the plaintiffs argue the Commissioner's failure to acquiesce to Eighth Circuit precedent on the subjective complaint issue is just one example of the Commissioner's overarching policy of actively resisting acquiescing to any Eighth Circuit precedent with which he does not agree unless he is explicitly told he must do so. In support of this allegation, the plaintiffs cite *Layton v. Heckler*, 726 F.2d 440 (8th Cir. 1984), where the Eighth Circuit held, "In view of the ALJ's failure properly to consider the subjective complaints of pain and the inadequacy of his credibility finding, we remand to the ALJ for reconsideration of whether Layton's pain is disabling. In doing so, we wish to underscore that we shall continue to upset the findings of the Secretary until such time as she sees fit to comply with the decisions of this Court." *Layton*, 726 F.2d at 442. Similarly, in *Hillhouse v. Harris*, 715 F.2d 428 (8th Cir.1983), the Eighth Circuit held,

> Although we need not decide the issue in this case, we note the Secretary continues to operate under the belief that she is not bound by district or circuit court decisions. In its findings the Appeals Council states, "the Secretary is bound only by the provisions of the Social Security Act, regulations and rulings, and by United States Supreme Court decisions. A district or circuit court decision is binding only in the specific case it decides." ... The result of this individual case should not obscure the fact that the regulations of HHS are not the supreme law of the land. "It is, emphatically, the province and duty of the judicial department, to say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), and the Secretary will ignore that principle at his peril.

*Hillhouse*, 715 F.2d at 430.[15]

The plaintiffs also argue DDS fails to follow *Polaski*'s subjective complaint standard

for reasons not directly related to the Commissioner. First, they point to Dr. Staples's deposition where he testified when he compiles an RFC form:

> I evaluate all of the cases using the same general manner. You look at what are the allegations. What is the onset of allegation? What is the objective evidence to support this based on the treating physician? The studies that have been done, range of motions, X rays, all of that, and an ADL, and *then one comes up with what seems to be reasonable based on the objective evaluation of the objective material.*

Plaintiffs' Statement of Undisputed Facts, ¶ 62. Dr. Staples also testified about subjective complaints stating:

> Who am I to say they're correct or not correct. I go by what's in the record, objective evaluation of—as much objective evidence there is, and I don't feel it's appropriate for me to comment on the correctness or not correct or incorrectness of claimants' allegations.

Plaintiffs' Statement of Undisputed Facts, ¶ 65. These statements, the plaintiffs argue, shows DDS medical consultants place an undue emphasis on objective evidence at the expense of subjective complaints. The court agrees these statements, especially the latter, evidence a belief on Dr. Staples's part that objective medical evidence should take precedence over claimants' subjective complaints.

In response, the defendants highlight Dr. Staples's testimony where he explained he reviews, "everything in this file," and where he explained he includes a claimant's application for benefits, disability report, medical records, tests, opinions, follow-up care, activities of daily living, any information related to pain, success of medication and vocational reports, in making his disability determination in compiling an RFC. Staples Tr. at 26–27, 35, 37. This response is somewhat off the

---

15. In a concurring opinion, Judge McMillian added:

> While I concur wholly in everything said in the majority opinion, I think more is needed to be expressed. I have no wish to invite a confrontation with the Secretary. Yet, if the Secretary persists in pursuing her nonacquies-

cence in this circuit's decisions, I will seek to bring contempt proceedings against the Secretary both in her official and individual capacities.

*Hillhouse*, 715 F.2d at 430 (McMillian, J., concurring).

mark, for the plaintiffs' claim is not that the DDS process fails to consider a claimant's subjective medical evidence whatsoever, rather, the plaintiffs argue that the DDS process fails to give claimants' subjective complaints of pain the proper weight they deserve. The defendants also highlight portions of Dr. Wright's testimony for the same reasons they highlighted portions of Dr. Staples's testimony. Again, this testimony is relevant, but does not go to the heart of the plaintiffs' complaint.

The plaintiffs also argue several DDS medical examiners spend too little time with each file to do much more than review the objective medical evidence. The defendants' responses to the plaintiffs' discovery requests revealed over month-long periods in 1994, at least three DDS medical consultants (Drs. Staples, Weis, and Hepplewhite) spent an average of less than twenty minutes reviewing each of their files. To facilitate the consultants' perusals of the files, DDS staffers prepare the files by highlighting the objective evidence with paper clips. It is impossible, the plaintiffs argue, for the medical consultants to review anything other than the highlighted objective evidence in the brief time they spend with each file, and such practices contribute to a *de facto* devaluation of subjective complaints.

The defendants' response is twofold. First, the defendants highlight Dr. Wright's testimony in which he testified an average case takes thirty-five to forty minutes to review, while some cases can take up to several hours. Wright Tr. at 9. This evidence ameliorates, at least somewhat, the plaintiffs' systemic complaint. It does not, however, address the specific complaints about Drs. Staples, Weis, and Hepplewhite. Second, the defendants argue the plaintiffs carefully selected the cases they presented to the court in order to showcase only the most contentious disability files. The court finds merit in the defendants' argument. Indeed, it is hard to imagine the plaintiffs would take any other tact than to put forward their best evidence. In evaluating the evidence on this point, the court acknowledges that the disability cases it reviews as part of its normal docket are also likely to be more complicated

than the average disability case. Nonetheless, having reviewed hundreds of disability files itself, the court is well enough versed in this area to conclude that, even in the "easy" cases where the law unequivocally demands a verdict for either the Commissioner or the claimant, and even when conducted by a medical professional, a twenty-minute review of a Social Security file cannot provide the scrutiny that most claimants' cases deserve.

Finally, the plaintiffs argue individual examinations of Paula Laird's and William Meeks's cases show DDS medical consultants do not properly evaluate subjective complaints as they relate to the intensity, frequency and duration of claimants' symptoms. In the case of Paula Laird, her most disabling symptom was her alleged need to nap for an hour and a half each day. In fact, the vocational expert who testified at Laird's disability hearing stated that such a requirement would preclude her from working in the competitive economy. In compiling a mental residual functional capacity assessment for Laird, DDS medical consultant Dr. Wright failed to mention Laird's alleged need to nap—the most important of her subjective symptoms of depression. The plaintiffs argue this omission violated the dictates of *Polaski*.

In the case of William Meeks, Meeks's personal physician, Dr. Jerome, examined Meeks and concluded he needed to be sedentary. Meeks himself testified he could only walk two blocks at a time. When DDS medical consultant Dr. Staples reviewed Meeks's files, however, he concluded there was no objective evidence to conclude Meeks should be "sedentary." In fact, Dr. Staples found Meeks could lift twenty pounds for two to three hours of an eight-hour work day, lift ten pounds for five to six hours of an eight-hour work day, and stand or walk for five to six hours of an eight-hour work day. Again, the plaintiffs argue Dr. Staples's choice to rely solely on objective evidence to support a disability claim completely ignored Meeks's corroborating subjective evidence. The plaintiffs have also submitted excerpts from consultants' reports from other class members. Rather than recount details of each of the sixty-two cases the plaintiffs have pre-

sented for the court's review, it is sufficient to say that in a significant percentage of the cases, as was the case in Laird's and Meeks's cases, DDS medical consultants place undue emphasis on objective medical evidence at the expense of the claimants' subjective complaints about the intensity, frequency and duration of their pain.

In response to the plaintiffs, the defendants argue the Commissioner could not possibly fail to give the proper weight to claimants' subjective complaints of pain because every decision a Social Security adjudicator makes is consistent with *Polaski* as well as the current C.F.R. regulations and Social Security rulings. This fails to acknowledge the plaintiffs' argument that portions of the pertinent C.F.R. regulations and Social Security rulings conflict with *Polaski* and are, therefore, invalid. The plaintiffs do, in fact, concur that most of the Commissioner's decisions comply with the pertinent federal rules and regulations. The defendants also devote much of their lengthy reply brief to contesting the plaintiffs' conclusion that, under the system as it is now operated by DDS, unless a Social Security claimant can produce objective medical evidence of a disability, the claimant cannot prove he or she is "disabled" as defined by DDS. As discussed above there are a number of arguments, especially statutory arguments, which strongly contradict the plaintiffs' conclusion and strongly support the defendants' position. The problem with relying exclusively on statutory arguments, from the defendants' perspective, is that it is unfair to evaluate those arguments in isolation, detached from their historical context. As mentioned, viewed in light of the Commissioner's decision to treat SSR 96–7p as one which clarifies existing policy rather than changes it outright, the defendants' claims are significantly weaker.

Having reviewed the arguments for both sides, the court is persuaded the plaintiffs have met the burden of proving that even in the light most favorable to the defendants, *Krenik,* 47 F.3d at 957, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 538, no reasonable trier of fact could find for the defendants on this issue, *Commercial Union,* 967 F.2d at 272, *Anderson,* 477 U.S. at 248,

106 S.Ct. at 2510, and therefore the plaintiffs are entitled to a judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The court is persuaded it has reached the correct decision for a number of reasons, many of which it has already discussed in the preceding analysis. The strongest reasons for granting the plaintiffs' motion for summary judgment have to do with failures of DDS to follow the dictates of *Polaski.* Ultimately, however, it is the combination of the Commissioner's failure to change her policy and DDS's failure to follow *Polaski* in the past which convinces the court is has reached the proper conclusion. If the plaintiffs had shown DDS did not follow *Polaski* in the past, but there was also evidence that DDS's new policies conformed to *Polaski,* that evidence alone would not meet the standards for summary judgment. Likewise, if the plaintiffs' only evidence of the defendants' misdeeds was the Commissioner's failure to note that SSR 96–7p was a change in policy rather than a mere clarification, there might still be a material question of fact as to whether the precise wording of the policy affected the results of claimants' disability determinations. Here, however, the plaintiffs have shown by more than a preponderance of the evidence that when the issue moves from the theoretical to the empirical and DDS medical consultants make concrete decisions with lasting effects on people's lives, the consultants use the wrong standard. The testimony of the medical consultants; the evidence regarding the time the medical consultants spend on each case and the material that is highlighted prior to their reviewing the files; the alleged failure to train DDS staff and contractees since November 1, 1994; and the medical consultants' reports on Paula Laird, William Meeks and the sixty-two other claimants conclusively show that once a Social Security claimant has established by medically acceptable objective evidence an underlying impairment that could reasonably be expected to cause pain, DDS gives undue weight to the objective medical evidence supporting a claimant's claims at the expense of the claimant's subjective complaints about the intensity or degree of his or her pain in determining whether the claimant is disabled. In so doing, the Commissioner violates the dictates of *Pola-*

*ski.* Because the newest Social Security rulings have not changed DDS's longstanding policy, there is no reason to believe DDS's disability determination procedures will change either.

### C. Whether DDS Makes Express Credibility Determinations

 The second subpart of the plaintiffs' first claim is that the Commissioner does not require the DDS to make "express credibility determinations" regarding claimants' testimony which explains what part of the testimony the adjudicator accepts, what part he or she rejects, and his or her reasons for doing so. The Eighth Circuit has held that, "When making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir.1996) (citing *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995)). Such a finding is required to demonstrate the ALJ considered and evaluated all of the relevant evidence. *See Marciniak v. Shalala,* 49 F.3d 1350, 1354 (8th Cir.1995) (citing *Ricketts v. Secretary of Health and Human Servs.,* 902 F.2d 661, 664 (8th Cir.1990)). In addition, "An administrative law judge must do more than make cursory reference to *Polaski* when examining the evidence relating to a claimant's subjective complaints of pain. *Polaski* requires an examination of five factors in such cases and a discussion in the record of the relation of those factors to the evidence." *Cline v. Sullivan,* 939 F.2d 560, 569 (8th Cir.1991). However, if "the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion," but "acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain.... An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case." *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996) (citing *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987)). It is clear from the above analysis that DDS is required to make express credibility determinations. The fighting issue is whether DDS actually does this.

In their brief, the plaintiffs cite SSR 96–7p and describe that ruling as a vast improvement over previous rulings which addressed the issue. Social Security Ruling 96–7p provides:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Social Security Ruling 96–7p, 1996 WL 374186 at *1 (July 2, 1996). A similar ruling, SSR 96–8p provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96–8p, 1996 WL 374184 at *6–*7 (July 2, 1996). Taken together these rulings clearly require adjudicators to make express credibility determinations. Significantly, SSR 96–8p does not proclaim to clarify the Commissioner's policy, it merely states the policy. This is important because it does not harken back to past rulings which were incorrect statements of the law. While the stated purpose of SSR 96–7p is to clarify policy, it specifically provides the particular policy points it clarifies have to do with the weight given to objective medical evidence and claimant's subjective complaints.

■ As for the manner in which these new regulations are actually carried out, the plaintiffs have not submitted any exhibits which show that DDS continues to neglect to make express credibility determinations even though its regulations have been changed. The case histories the plaintiffs submitted are not dated, but the discovery deadline in this case was May 1, 1996, and Social Security rulings 96–7p and 96–8p went into effect July 1, 1996. Based on this chronology, the court can only assume all of the case histories to which the plaintiffs refer were created prior to July 1, 1996.[16] As the state of the record now stands, there is no evidence to show that, pursuant to its new policy, DDS either makes or does not make credibility determinations. Therefore, before the trial on the merits, the court directs the parties to agree among themselves on a method of selecting a random sample of post–July 1, 1996, DDS case files to be reviewed for the presence of express credibility determinations. The parties should also agree on the size of the random sample. In no case, however, should the random sample include more than 500 cases. After each party conducts its independent review of each sample case, the parties will exchange their conclusions and their reasons for their conclusions with the other party. The parties will then compare each other's conclusions and, at trial, will present to the court only those cases in which the parties reach different conclusions as evidence that DDS either does or does not make express credibility determinations.

As the court explained above, it was the combination of (1) DDS continuing its old policy, and (2) evidence that under its old policy DDS did not follow *Polaski*, that led the court to conclude there was no question of material fact. In this case it is unknown what impact SSR 96–7p or 96–8p will have on the manner in which DDS makes express credibility determinations. As such, there exists a genuine issue of material fact which precludes the court from granting summary judgment for either party.

### D. Whether DDS Uses The Services Of Qualified Vocational Specialists When Evaluating Social Security Claims

Only the defendants have moved for summary judgment on the third subpart of the plaintiffs' first claim, therefore, "any inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Krenik*, 47 F.3d at 957 (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). With respect to this claim, the plaintiffs are the nonmoving party.

The third subpart of the plaintiffs' first claim is that the persons the Commissioner uses to evaluate Social Security claims and make vocational determinations are not "vocational specialists" within the meaning of the established law and, therefore, are unqualified to perform their assigned jobs. The vocational determinations at issue are those made "on paper" by "vocational specialists" (disability examiners with extra training) at the initial determination stage, not those later determinations made by ALJs at administrative hearings. The plaintiffs argue that SSA rules, regulations and policies, as well as judicial standards set forth in Eighth Circuit decisions, require that "qualified vocational specialists" be used to make vocational determinations. The claimants ar-

---

16. There are some dates which are part of the case histories. All of these dates are prior to July 1, 1996, which further leads the court to suspect none of the case histories submitted as attachments to the plaintiffs' memorandum in support of their motion were produced after SSR 96–7p and 96–8p went into effect.

The defendants argue the case histories are of little value regardless, because they were not randomly selected from the entire set of cases and claimants which make up the class of plaintiffs in this case. Based on the above findings, the court need not address this argument.

gue that vocational specialists who make these initial determinations must have substantially the same qualifications as the vocational experts who advise ALJs at the disability hearings.[17]

In support of their argument that qualified vocational experts are required at the DDS level, the claimants cite 20 C.F.R. §§ 404.1566(e) and 416.966(e) (1996). Those identical regulations provide:

> If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

20 C.F.R. §§ 404.1566(e) and 416.966(e) (1996). Along the same lines, the claimants cite *Hall v. Chater*, 62 F.3d 220, 224 (8th Cir.1995), where the Eighth Circuit held:

> In a case of solely exertional impairments the Secretary may consult the medical-vocational guidelines to meet her burden of proving the availability of jobs in the national economy that the claimant can perform. *Stewart v. Secretary*, 957 F.2d 581, 586 (8th Cir.1992). *If, however, the claimant also has a non-exertional impairment, such as pain, "the Secretary must use vocational expert testimony or other similar evidence to meet the burden of showing the existence of jobs in the national economy that the claimant is capable of performing." Ibid.* (citations omitted).

*Hall*, 62 F.3d at 224 (emphasis added) (some citations omitted). The claimants also cite the preamble to a Final Rule published in the Federal Register in which the Secretary of the Department of Health and Human Services noted that the disability determination process "requires the action of many individuals ranging from routine clerical actions to sophisticated analysis by medical and vocational experts." 51 Fed.Reg. 15,638 (April 25, 1986). For additional support, the claimants cite SSR 83–14 which provides:

> Use of a vocational resource may be helpful in the evaluation of what appear to be "obvious" types of cases. *In more complex situations, the assistance of a vocational resource may be necessary.* The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient for relatively simple issues. *In more complex cases, a person or persons with specialized knowledge would be helpful.*

SSR 83–14, 1983 WL 31254, at *4 (1983) (emphasis added).

From their reading of these federal regulations and *Hall*, the claimants draw this conclusion: *At each step* of the disability-granting process, the DDS must employ decision makers who possess the "specialized knowledge" such that they can make proper disability determinations in the "difficult" case. Though they do not define the term "specialized knowledge," it is clear that the claimants believe this level of knowledge is tantamount to that level of knowledge possessed by a vocational expert. Next, the claimants argue that, it takes only eighteen months of experience for a DDS hire to become a "vocational specialist," and in that time it is impossible for the average worker to attain the level of "specialized knowledge" necessary to consistently make a proper disability determination in the "difficult" case. Because the only people who make disability determinations at the initial stage of the benefits granting process are vocational specialists, the claimants allege that the DDS does not fulfill its statutory and case law obligation to provide decision makers with the specialized knowledge necessary to make disability determinations at the initial level of the benefits granting process.

---

**17.** In order to work as a vocational expert, an individual must have the following credentials:
 (1) graduate degree in vocational rehabilitation;
 (2) current and extensive experience in counseling and the actual job placement of adult handicapped people who have worked;
 (3) up-to-date knowledge of, and experience with, industrial and occupational trends and local labor market conditions; and
 (4) current knowledge and use of a variety of vocational reference sources.
Vocational Expert/Medical Expert section, POMS Manual (1991).

The plaintiffs also offer selected case histories which they believe constitute empirical proof that the DDS's vocational specialists are incapable of making the correct vocational decisions. The case histories include the story of class representative Meeks. The DDS medical consultant found Meeks has "limited" hearing. The DDS vocational specialist found Meeks could return to his past limited work as a salesman. According to the DOT, however, work as a salesman requires "frequent" hearing. In Appendix B, attached to their memorandum in support of their resistance to the defendants' motion for summary judgment, the plaintiffs provide seven other similar examples where vocational specialists found that Social Security applicants could perform jobs which the medical evidence indicated they could not perform.

In response, the defendants argue that the regulations which govern the qualifications of those who make vocational decisions at the DDS level are found at 20 C.F.R. Part 404, Subpart P, Appendix 2, 200.00 et seq. (1996). The court agrees with the defendants that the previously-mentioned sections are concerned with vocational issues at the DDS level. Unfortunately, in its examination of these sections, the court could not find any mention of the educational or experience requirements a decision maker must possess before he or she is qualified to make vocational decisions.

The defendants also cite SSR 83–14 (as did the plaintiffs) to support their position that its vocational specialists are qualified to make vocational decisions. The defendants draw the court's attention to the portion of the Ruling which provides:

Use of a vocational resource may be helpful in the evaluation of what appear to be "obvious" types of cases. In more complex situations, the assistance of a vocational resource may be necessary. The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful. State agencies may use personnel termed vocational consultants or specialists, or they may purchase the services of vocational

evaluation workshops. Vocational experts may testify for this purpose at the hearing and Appeals Council levels. In this PPS, the term vocational specialist (VS) describes all vocational resource personnel.

SSR 83–14, 1983 WL 31254, at *4 (1983). The defendants argue correctly that SSR 83–14 draws a distinction between "vocational consultants or specialists," on the one hand, and "vocational experts" who "may testify for this purpose at the hearing and Appeals Council levels," on the other hand. The defendants argue that the Ruling clearly implies a difference in the level of expertise between the two groups.

In addition to arguing they are under no obligation to employ vocational experts to rule on vocational issues at the DDS level, the DDS argues that the set of people they do hire to make such decisions—the vocational specialists—are well trained to perform their jobs. As mentioned, vocational specialists are disability examiners with additional training. The additional training includes instruction on the use of vocational resources such as the Dictionary of Occupational Titles. The DDS argues that the combination of additional training and the requirement that only experienced disability examiners may apply to be vocational specialists, results in well-trained vocational specialists who make correct decisions a vast majority of the time.

The defendants take issue with the plaintiffs' use of case histories to prove their allegation that vocational specialists are not capable of making appropriate vocational evaluations. The defendants argue that, even if the case histories the plaintiffs highlighted were decided incorrectly, these mistakes are aberrations. It is not enough, they argue, for the plaintiffs to point out eight mistakes and ask the court to declare that all of their vocational specialists are incapable of performing their assigned duties. The defendants also cite the latest statistics from the Kansas City DQB which show that, of 572 cases the DQB reviewed, only 24 (4.2%) contained incorrect vocational decisions which denied benefits to claimants who were incapable of performing jobs which existed in substantial numbers in the national economy.

The court is impressed with the briefing the parties have managed to prepare on this issue. Unfortunately, the parties were hampered by a lack of authority describing the precise qualifications a vocational specialist must possess. For all the sources the plaintiffs and defendants have cited, the court concludes that the defendants have come closest to describing the state of this issue when they argued that what authority there is on this issue clearly indicates that there is some difference in the level of expertise between a vocational expert and a vocational specialist. Even so, it is difficult, if not impossible, to define the legally-acceptable extent of the difference in these levels of expertise.

Because nowhere in the established law is there an overt delineation of the training and qualifications necessary to serve as a vocational specialist, the only way the court knows of determining whether the DDS Vocational specialists are capable of performing their statutorily-assigned duties is to review the vocational specialists' work product. Both the plaintiffs and the defendants tried, in their own way, to show that a review of the DDS vocational specialists' performance supports their side's position. The plaintiffs supported their argument by compiling eight examples where DDS vocational specialists made erroneous vocational capacity decisions. The defendants supported their argument by citing the statistics from the Kansas City DQB which showed, according to the DQB's standards, the DDS vocational specialists make mistakes only about once in every twenty-four decisions. Both attempts left something to be desired. On one hand, the plaintiffs highlighted eight decisions made by DDS vocational specialists which the plaintiffs identified as mistakes. In Appendix B to their brief, the plaintiffs explained their bases for describing these decisions as mistakes. Nonetheless, without knowing if these are all the mistakes the plaintiffs actually attribute to DDS vocational specialists (and without knowing how many total decisions were involved) it is impossible for the court to evaluate the strength of the plaintiffs' arguments. On the other hand, in the defendants' review of DDS vocational specialists' decisions, they provide the relevant statistics which are lacking in the plaintiffs' brief. The defendants, however, do not describe their bases for deciding which particular decisions were correct and which were incorrect.

■ As long as the plaintiffs and defendants present different methods of proving through empirical evidence that the DDS vocational specialists either are or are not qualified to perform their assigned jobs, the court cannot imagine it will be able to make a fair determination of the merits of the issue. The court has no option but to order the parties to engage in a process similar to the one in which it ordered the parties to engage previously. Before the trial on the merits, the court directs the parties to agree among themselves on a method of selecting a random sample of DDS case files to be reviewed for evidence that the DDS "vocational specialists" are unqualified to perform their assigned jobs. The parties should also agree on the size of the random sample. In no case should the random sample include more than 500 cases. After each party conducts its independent review of each sample case, the parties will exchange their conclusions,[18] and their reasons for their conclusions [19] with the other party. The parties will then compare each other's conclusions and, at trial, will present to the court only those cases in which the parties reach different conclusions as evidence that the DDS vocational specialists are unqualified to perform their assigned jobs.

On the present state of the record, however, the court finds that summary judgment is not appropriate on this issue because there is a dispute between the parties as to a genuine issue of material fact, therefore, the moving party is not entitled to a judgment as a matter of law. *Beyerbach*, 49 F.3d at 1325, *Fed.R.Civ.P.* 56(c). For that reason, it is appropriate to deny the defendants' motion for summary judgment on this issue.

---

18. The four possible conclusions will be: benefits rightly denied, benefits wrongly denied, benefits rightly granted, or benefits wrongly granted.

19. The plaintiffs' Appendix B does a good job of providing a succinct basis for their conclusions.

**E. Whether DDS Fails to Properly Assess Residual Functional Capacities With Sufficient Detail as Required by Federal Regulations and Eighth Circuit Standards**

Only the defendants have moved for summary judgment on the fourth subpart of the plaintiffs' first claim, therefore, "any inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Krenik,* 47 F.3d at 957 (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356). With respect to this claim, the plaintiffs are the nonmoving party.

The fourth subpart of the plaintiffs' first claim is that the DDS workers who prepare Social Security claimants' residual functional capacity reports do not make detailed enough reports to meet the standards required by federal regulations and Eighth Circuit case law. As mentioned previously, DDS psychological and medical consultants prepare either mental residual functional capacity assessments (MRFCAs), physical residual capacity assessments (PRFCAs), or both types of assessments for every claimant who applies for Social Security benefits. By combining the MRFCAs and PRFCAs, the consultants develop a residual functional capacity (RFC) which describe just what work-related skills and abilities a claimant has remaining after taking into account all of his or her physical and psychological limitations. Or, as defined in 20 C.F.R. § 404.1545(a) (1996), "Your residual functional capacity is what you can still do despite your limitations."

To support their claim that the DDS consultants do not prepare detailed enough RFCs, the plaintiffs cite a number of sources of law which, they argue, set the standards for RFCs. First, the plaintiffs point out that the check-box type forms the DDS consultants use to prepare the RFCs are of limited value in assessing a claimant's vocational abilities. *See, e.g., McCoy v. Schweiker,* 683 F.2d 1138, 1147 n. 8 (8th Cir.1982) (en banc) ("[A]s a general rule little weight is afforded to RFC checklists."). The plaintiffs also cite a number of SSRs which describe what must be contained in an RFC. For example, SSR 82–53, provides that an RFC must be "fully

responsive to the claimant's statements, including those about symptoms (especially pain) which concern the nature and extent of the impairments." SSR 82–53, 1982 WL 31374, *5 (1982). SSR 82–62 provides that an RFC "must be developed and explained fully in the disability decision." SSR 82–62, 1982 WL 31386, *3 (1982). It continues, "Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.* SSR 85–16 provides that an RFC should include "all limits on work-related activities resulting from the mental impairment must be described in the mental RFC assessment." SSR 85–16, 1985 WL 56855, *2 (1985). These requirements are applied to state disability determinations in SSR 96–8p. SSR 96–8p, 1996 WL 374184, *8 (July 2, 1996). The plaintiffs also argue that 42 U.S.C. § 423(d)(2) (1996) requires the DDS to make a "realistic evaluation" of the mental and physical limitations on a claimant's ability to work.

In addition to citing Social Security Regulations, the plaintiffs point out that the only procedural posture in which the Eighth Circuit has the opportunity to rule on the requirements of an RFC is when it reviews an ALJ's denial of benefits. During Social Security hearings, the ALJ poses a hypothetical question to a vocational expert. The hypothetical question must describe all of the physical and mental limitations of that particular claimant. The hypothetical questions posed at administrative hearings, therefore, are analogous to RFCs used at the DDS level. The Eighth Circuit has commented numerous times on the contents of the hypothetical question. To wit: "The point of the hypothetical question is to clearly present to the VE [vocational expert] a set of limitations that mirror those of the claimant." *Roe v. Chater,* 92 F.3d 672, 676 (8th Cir.1996) (citing *Hogg v. Shalala,* 45 F.3d 276, 279 (8th Cir. 1995)). When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. *Id.* (citing *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994)). This is because, "A vocational expert

cannot be assumed to remember all of a claimant's impairments from the record." *Newton v. Chater,* 92 F.3d 688, 694 (8th Cir.1996) (citing *Whitmore v. Bowen,* 785 F.2d 262, 263–64 (8th Cir.1986)). For this reason, "[T]he ALJ must set forth all of the claimant's disabilities when posing a hypothetical question to the VE." *Ostronski v. Chater,* 94 F.3d 413, 420 (8th Cir.1996) (citing *Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991)).

From the above-cited regulations and judicial opinions, the plaintiffs argue, it is clear that an RFC must contain all of a claimant's physical and mental limitations. Having established, they believe, the need for a thorough RFC, the plaintiffs argue that the RFCs the DDS consultants produce are anything but thorough. As proof of this, the plaintiffs have produced synopses of seven cases where they believe the consultants' RFCs were impermissibly incomplete. These synopses are located in Table 1 of Appendix A, attached to the plaintiffs' memorandum in support of their resistance to the defendants' motion for summary judgment.

In response, the defendants argue that, at the DDS level, the vocational specialists consider all the evidence pertaining to the claimants' alleged impairments as is required by the pertinent C.F.R. sections, Social Security Regulations and case law. They also highlight the depositions of Drs. Wright and Staples who testified they consider all of the evidence in a given case when making their RFC determinations. The defendants also point to the results of the Kansas City DQB which found that, for fiscal years 1994–96, only one of 158 cases (0.6%) was found to have a mental RFC deficiency which, when corrected, would have resulted in an allowance rather than a denial, and only eight of 414 cases (1.9%) were found to have physical RFC deficiencies which, when corrected, would have resulted in allowances rather than in denials.

The defendants also draw the court's attention to SSR 96–8p, which provides:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory find-

ings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96–8p, 1996 WL 374184 at *6 (July 2, 1996). The defendants argue that this Ruling resolves whatever deficiencies there may have been in RFC development process prior to its issuance.

■ The court has reviewed both parties' arguments carefully. It is clear from the regulations and cases cited by the plaintiffs that an RFC needs to be a thorough recounting of a claimant's vocational limitations. Recently issued Social Security Ruling 96–8p, which the plaintiffs cite, only reconfirms this requirement. Therefore, when the defendants argue that SSR 96–8p resolves whatever deficiencies there may have been in the RFC-developing process, their argument does not carry much weight. If the DDS consultants could not develop proper RFCs prior to SSR 96–8p's issuance, they surely cannot do so now. The real question, however, is whether the DDS consultants can develop proper RFCs. In this sense, this court faces the same problems in resolving this issue at the summary judgment stage as it did in resolving the previous issue at the summary judgment stage, i.e., the plaintiffs have presented a small number of concrete examples of RFC mistakes, and the defendants have presented a large-scale survey of RFC determinations, but they have not provided the court with the cases upon which their survey results are based.

The court has no option but to order the parties to engage in a similar process as the one in which it ordered the parties to engage previously. Before the trial on the merits, the court directs the parties to agree among

themselves on a method of selecting a random sample of cases to be reviewed for errors by DDS medical and psychological consultants in the preparation of RFCs. The parties should also agree on the size of the random sample. In no case should the random sample include more than 500 cases.[20] After each party conducts its independent review of each sample case, the parties will exchange their conclusions, and their reasons for their conclusions with the other party. The parties will then compare each other's conclusions and, at trial, will present to the court only those cases in which the parties reach different conclusions as evidence that the DDS consultants are not preparing proper RFCs.

On the present state of the record, the court finds that summary judgment is not appropriate on this issue because there is a dispute between the parties as to a genuine issue of material fact, therefore, the moving party is not entitled to a judgment as a matter of law. *Beyerbach*, 49 F.3d at 1325, *Fed.R.Civ.P.* 56(c). For that reason, it is appropriate to deny the defendants' motion for summary judgment on this issue.

### F. Whether the Disability Benefits Granting Process Denies the Plaintiffs Equal Protection of the Law

Only the defendants have moved for summary judgment on the plaintiffs' fifth claim, therefore, "any inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party." *Krenik*, 47 F.3d at 957 (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). With respect to this claim, the plaintiffs are the nonmoving party.

The plaintiffs' fifth claim is based on the equal protection clause of the Constitution. The plaintiffs argue the disability benefits granting process established two separate classes of benefits applicants, one of which receives preferable treatment when applying for benefits. In a nutshell, the plaintiffs argue that, at the DDS–level, the adjudicators do not follow Eighth Circuit precedent, while at the administrative level, the ALJs do

follow Eighth Circuit precedent. Those claimants with greater financial resources, stamina or tenacity than other claimants will naturally reach the administrative level of benefits granting process. The plaintiffs argue that the persistent claimants are more likely to obtain a benefits award because Eighth Circuit precedent is more favorable than the precedent that prevails at the DDS level. In this way, the plaintiffs argue, the Social Security granting process has established *de facto* set of two classes among potential Social Security claimants.

In support of their argument, the plaintiffs cite *Stieberger v. Heckler*, 615 F.Supp. 1315, 1363 (S.D.N.Y.1985), where the plaintiff made an equal protection claim identical to the claim in this case. The *Stieberger* court found some merit in the plaintiff's claim and held:

> We assume that plaintiffs, as indigent and physically or mentally impaired individuals seeking an entitlement to Social Security disability benefits, are entitled to no more than the rational basis standard of equal protection scrutiny. Nevertheless, the arbitrary distinctions created by the Secretary's non-acquiescence policy, regarding those claimants who obtain a disability determination in accordance with circuit court precedents and those claimants who do not, cast serious doubt on the validity of the Secretary's non-acquiescence policy.

*Stieberger*, 615 F.Supp. at 1363 (citations omitted). In support of its decision, the *Stieberger* court cited *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir.1983), where the Ninth Circuit addressed the similar equal protection claim. The Ninth Circuit held:

> The policy of nonacquiescence announced by the Secretary creates two standards governing claimants whose disability benefits are terminated as a result of such nonacquiescence. If such a claimant has the determination and the financial and physical strength and lives long enough to make it through the administra-

---

**20.** If unable to reach agreement on this matter or the similar matters discussed in the two previous sections, the parties shall file a report to the court and United States Magistrate Judge Zoss will resolve any dispute.

tive process, he can turn to the courts and ultimately expect them to apply the law as announced in Patti and Finnegan. If exhaustion overtakes him and he falls somewhere along the road leading to such ultimate relief, the nonacquiescence and the resulting termination stand. Particularly with respect to the types of individuals here concerned, whose resources, health and prospective longevity are, by definition, relatively limited, such a dual system of law is prejudicial and unfair.

*Lopez*, 713 F.2d at 1439.[21] *See also Jones v. Califano*, 576 F.2d 12, 18 (2d Cir.1978); and *Aldrich v. Schweiker*, 555 F.Supp. 1080, 1088 (D.Vt.1982).

The defendants counter that, in order to prove an equal protection clause violation, one must prove that the government has established a statutory classification that is either (1) based on a suspect classification, or (2) interferes with a fundamental right. *Spudich v. Smarr*, 931 F.2d 1278, 1280 (8th Cir.1991), *cert. denied, Spudich v. Supervisor of Liquor Control of Mo.*, 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991). The defendants argue that the current Social Security disability benefits granting process meets neither of these tests.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially the direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). Even so, "The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must co-exist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, —— U.S. ——, ——, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (citing *Person-*

*nel Administrator of Mass. v. Feeney*, 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)).

 The preliminary question the court must answer when conducting the equal protection analysis is whether the law burdens a fundamental right or targets a suspect class. When the classification is suspect or involves fundamental rights, it should be upheld only if the state action is necessary to serve a compelling state interest. *Plyler*, 457 U.S. at 216, 102 S.Ct. at 2394. This standard is referred to as "strict scrutiny." *See, e.g., Bernal v. Fainter*, 467 U.S. 216, 220, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984).

 In contrast, "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam)), "and need only to 'be rationally related to a legitimate state interest.'" *Christopher Lake Dev. Co. v. St. Louis County*, 35 F.3d 1269, 1274 (quoting *Dukes*, 427 U.S. at 303, 96 S.Ct. at 2517). This standard is known as the "rational basis" test. *See, e.g., Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993).

 Aside from fundamental rights and suspect classes, the equal protection clause "also protects citizens from arbitrary or irrational state action." *Batra v. Board of Regents*, 79 F.3d 717, 721 (8th Cir.1996). However, even to invoke the rational basis protection afforded against arbitrary or irrational state action, "courts have consistently required equal protection plaintiffs to allege and prove something more than different treatment by governmental officials." *Id.* The Eighth Circuit explained:

---

21. In *Lopez*, the Ninth Circuit denied the Social Security Administration's request for a stay of the district court's preliminary injunction preventing the Administration from engaging in its policy of not acquiescing to Ninth Circuit prece-

dent. *Lopez*, therefore, did not explicitly hold that Secretary's nonacquiescence policy violated the equal protection clause. Rather it found that the Administration had not proved is was likely they would succeed on the merits of the case.

As the Supreme Court said in *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944): The unlawful administration by state officers of a state statute fair on its face resulting in the unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden* confirms that the something more required of the plaintiff in this kind of equal protection case is the presence of an unlawful intent to discriminate against the plaintiff for an invalid reason. Plaintiff need not prove that another fundamental right was trampled—the right to equal protection of the laws is itself fundamental. Nor need plaintiff prove that he or she was victimized by a "suspect classification" such as race. But the discrimination must be intentional, and the government's motive must fail to comport with the requirements of equal protection. See *Dickens v. State of Missouri by Ashcroft,* 887 F.2d 895 (8th Cir.1989) (per curiam).

*Id.* That is to say, if the plaintiffs have only suffered in their capacity as "victims of random government incompetence," an equal protection claim is properly dismissed. *Id.* at 722.

■ In this particular case, the right at issue is the ability to receive Social Security disability benefits. In *Weinberger v. Salfi,* 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975), the Supreme Court ruled that Social Security benefits are not "fundamental rights" for purposes of an equal protection clause analysis. The Supreme Court held:

> [A] noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status, though of course Congress may not invidiously discriminate among such claimants on the basis of a bare congressional desire to harm a politically unpopular group, or on the basis of criteria which bear no rational relation to a legitimate legislative goal. Unlike the statutory scheme in [*Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63], the Social Security Act does not purport to speak in terms of the bona fides of the parties to a marriage, but then make plainly relevant evidence of such bona fides inadmissible. Like the plaintiffs in [*Starns v. Malkerson,* 326 F.Supp. 234 ( [D.]Minn.1970), *summarily aff'd,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971) ], appellees are completely free to present evidence that they meet the specified requirements; failing in this effort, their only constitutional claim is that the test they cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test.

*Weinberger,* 422 U.S. at 772, 95 S.Ct. at 2470 (internal citations and punctuation omitted) (emphasis added). *See also, Lavine v. Milne,* 424 U.S. 577, 585, n. 9, 96 S.Ct. 1010, 1015, 47 L.Ed.2d 249 (1976) ("Welfare benefits are not a fundamental right, and neither the State nor Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support.") (citing *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); *Alcala v. Burns,* 545 F.2d 1101, 1105 ("Welfare benefits are not available as a fundamental right.") (citing *Lavine* ). From the above cases, it is clear that Social Security disability benefits are not a fundamental right. If, therefore, the plaintiffs seek to invoke more than the deferential rational basis analysis for the equal protection claim, they must show they are members of a suspect classification.

■ The plaintiffs do not, of course, argue that the Social Security claimants who do not have the financial resources, stamina or tenacity to take their claims tó the administrative level of the benefits granting process constitute a suspect classification. It is hornbook law that protection afforded to suspect classifications is reserved for a select few groups. *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. ("[W]hen a statute classifies by race, alienage, or national origin ... these factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipa-

thy—a view that those in the burdened class are not as worthy or deserving as others."). It is also well established that poverty is, in and of itself, not a suspect class. *Maher v. Roe*, 432 U.S. 464, 470, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977) ("[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis.") (citing *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

Because the plaintiffs' equal protection claim neither (1) alleges interference with a fundamental right, nor (2) involves a suspect classification, the court must analyze the claim using the deferential rational basis standard of equal protection scrutiny. *Batra*, 79 F.3d at 721. Also, as mentioned in *Snowden,* the Supreme Court held:

> The unlawful administration by state officers of a state statute fair on its face resulting in the unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden,* 321 U.S. 1, 8, 64 S.Ct. 397, 401. Therefore, when this issue is decided on the merits, it will be the plaintiffs' burden, to show "an element of intentional or purposeful discrimination" on behalf of the defendants who have established and administer the disability benefits granting process in Iowa. At the summary judgment stage, however, it is still the defendants' burden to show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c).

As mentioned, the Ninth Circuit in *Lopez* reviewed a similar claim to the one the court reviews today. The *Lopez* court first concluded that plaintiffs needed to show intentional or purposeful discrimination in order to prevail on their equal protection claim. Then, the court held that a benefits granting process which only allows those with the most resources or tenacity to prevail on their benefits claims, "[p]articularly with respect to the types of individuals here concerned, whose resources, health and prospective longevity are, by definition, relatively limited," was inherently "prejudicial and unfair." *Lopez,* 713 F.2d at 1439. In other words, the very nature of the claim was enough to show the required prejudice. The disability benefits granting process described in *Lopez* is the same type of system that exists in Iowa and occurs as a result of the Commissioner's policy of nonacquiescence.

*Lopez* is helpful in resolving this motion for summary judgment, but this court must, of course, first look to Eighth Circuit precedent to resolve pending controversies. In *Batra,* the Eighth Circuit distinguished between "victims of random government incompetence" and those who actually suffer from "unlawful, purposeful discrimination." *Batra,* 79 F.3d at 721. Only the latter may make successful equal protection claims. This dichotomy is helpful in evaluating the plaintiff class's equal protection claim. From cases discussed earlier (such as *Hillhouse* where Judge McMillian excoriated the Secretary for her policy of nonacquiescence) it is clear that the Commissioner's policy of nonacquiescence is indeed purposeful. There may, in fact, be a legitimate, rational, nondiscriminatory reason the Commissioner chooses to embark on this policy of ignoring Eighth Circuit decisions. The defendants have not, however, offered an explanation for this policy in any of their numerous filings.

Had it been the plaintiffs who moved for summary judgment on this issue, the court's assigned task would be exponentially more difficult to complete. Indeed, there is hardly a material question of fact but that the defendants' policies are purposefully discriminatory and irrational. The court, however, need not answer that question at this juncture. Of relevance today is that, on the present state of the record, summary judgment is not appropriate on this issue because there is a dispute between the parties as to a genuine issue of material fact, therefore, the moving party is not entitled to a judgment as a matter of law. *Beyerbach,* 49 F.3d at 1325, *Fed.R.Civ.P.* 56(c). For that reason, it is appropriate to deny the defendants' motion for summary judgment on this issue.

## V. CONCLUSION

The court concludes that the plaintiffs' motion for summary judgment must be granted with respect to the first subpart of their first claim, that the DDS does not properly evaluate their subjective allegations under 20 C.F.R. §§ 404.1529 and 416.929 (1996), and *Polaski*. The plaintiffs' motion for summary judgment must be granted on the first subpart because the evidence on the records makes it clear that the DDS does not follow the Eighth Circuit's *Polaski* standard, and the year-old SSRs the Commissioner issued do nothing to direct DDS to discontinue its policy of not following *Polaski*. From this it follows that the defendants' motion for summary judgment on the plaintiffs' first issue must be denied.

The court concludes that both the plaintiffs' and defendants' motions for summary judgment must be denied with respect to the plaintiffs' second subpart of their first claim, that the Commissioner does not require the DDS to make "express credibility determinations" regarding claimants' testimony which explains what part of the testimony the adjudicator accepts, what part he or she rejects, and his or her reasons for doing so. Both motions for summary judgment must be denied on the second subpart because, even though it appears that DDS did not make express credibility determinations in the past, it is unknown what impact new Social Security Regulations 96–7p and 96–8p will have on the manner in which DDS makes express credibility determinations. There is, therefore, a genuine issue of material fact with respect to the plaintiffs' second issue. To resolve this factual dispute, the court has directed both parties to agree among themselves on a method of selecting a random sample of post–July 1, 1996, DDS case files to be reviewed for express credibility determinations. The random sample should include no more than 500 cases. After each party conducts its independent review of each sample case, the parties are to exchange their conclusions, and their reasons for their conclusions with the other party, compare each other's conclusions, and, at trial, present to the court only those cases in which the parties reach different conclusions as evidence that the, pursuant to its current policy, DDS either does or does not make express credibility determinations.

The court concludes that the defendants' motion for summary judgment must be denied with respect to the plaintiffs' third subpart of their first claim, that the persons the Commissioner uses to evaluate Social Security claims and make vocational determinations are not "vocational specialists" within the meaning of the established law and, therefore, are unqualified to perform their assigned jobs. The defendants' motion for summary judgment must be denied because both the plaintiffs and defendants have used conflicting methods of proving through empirical evidence that they should prevail on this subpart. There remains, therefore, a genuine issue of material fact with respect to this issue. To resolve this factual dispute, the court has directed both parties to engage in a similar process to that described in the paragraph above, and, at trial, present to the court only those cases in which the parties reach different conclusions with respect to the question of whether DDS vocational specialists have the proper training to perform their assigned jobs. The plaintiffs did not move for summary judgment on this issue.

The court concludes that the defendants' motion for summary judgment must be denied with respect to the fourth subpart of the plaintiffs' first claim, that the DDS workers who prepare Social Security claimants' residual functional capacities do not make detailed enough reports to meet the standards required by federal regulations and Eighth Circuit case law. The defendants' motion for summary judgment must be denied because both the plaintiffs and defendants have used conflicting methods of proving through empirical evidence that they should prevail on this claim. There remains, therefore, a genuine issue of material fact with respect to this issue. To resolve this factual dispute, the court has directed both parties to engage in a similar process that described two paragraphs above, and, at trial, present to the court only those cases in which the parties reach different conclusions with respect to the question of whether a DDS consultant prepared an improper RFC. The plaintiffs

did not move for summary judgment on this issue.

The court concludes that the defendants' motion for summary judgment must be denied with respect to the plaintiffs' second claim that the defendants are violating their right to equal protection of the law because the disability benefits granting process establishes two separate classes of benefits applicants, one of which receives preferable treatment when applying for benefits. The defendants' motion for summary judgment must be denied because they have not offered a legitimate, rational, nondiscriminatory reason the Commissioner elected to follow the policy of nonacquiescence with respect to the rulings of the Eighth Circuit Court of Appeals. There remains, therefore, a genuine issue of material fact with respect to this issue. The plaintiffs did not move for summary judgment on this issue.

**IT IS SO ORDERED.**